**GRAYBAR ELECTRIC COMPANY, INCORPORATED**

v.

**John DOLEY et al.**

**Civ. A. No. 583.**

United States District Court
E. D. Virginia,
Newport News Division.

May 20, 1959.

Israel Steingold, Richmond, Va., Samuel A. Steingold, Norfolk, Va., Meredith A. House, Richmond, Va., for plaintiff.

William McL. Ferguson, Newport News, Va., G. William White, Jr., Richmond, Va., for defendants.

STERLING HUTCHESON, Chief Judge.

This case is before the Court in a somewhat unusual situation. A number of preliminary steps have taken place. So far as pertinent here they may be briefly described as follows. After the complaint was filed the defendants filed a motion for summary judgment. The motion for summary judgment was heard and overruled upon the theory that the plaintiff might produce evidence throwing light on the intention of the parties in regard to the agreement dated January 24, 1952, which will be later discussed. A motion to amend the complaint was filed by the plaintiff. A jury was empaneled and evidence was introduced. At the conclusion of the hearing it was obvious that there was no issue of fact to submit to the jury. Consequently the jury was discharged and the case is now before the Court for disposition upon the legal questions presented.

The record discloses the following facts.

Eastern Broadcasting Corporation, a Virginia corporation with its place of business at Newport News, Virginia, hereinafter called Eastern, filed an application with the Federal Communications Commission, hereinafter called FCC, to obtain a permit to operate a television station in the Newport News area. Without undertaking a technical discussion, it may not be amiss to mention that the operation contemplated what is referred to as Ultra High Frequency, which was an innovation in telecasting in the area involved. That application was filed some time in late 1951 or early 1952.

In compliance with the requirements of FCC, a financial statement was submitted setting forth the estimated cost of the installation and the assets of Eastern, indicating a net worth of $48,519.16 as of February 25, 1952. There was also filed with the application an agreement dated January 24, 1952. Under that agreement the defendants, who were stockholders of the corporation, after reciting the necessity that the corporation show its financial ability to "follow through on the construction and operation" of said television broadcasting station and the desire of the parties to insure such ability, agreed between themselves that should the permit and license be granted they would undertake and agree to make available to the corporation sufficient sums of money to meet "all requirements of cash commitments which may be needed either to meet the actual cost of such construction and operation or to meet the minimum require-

ments specified by the Federal Communications Commission". The parties thereby agreed to make available to the corporation in cash such sums as the Board of Directors of the corporation might require of them not in excess of amounts set forth opposite the names of the respective individuals.

It was provided that money advanced pursuant to that agreement should be in the form of a loan to the corporation, to bear interest at the rate of 4% per annum and be payable out of operating revenue of the corporation. It was further agreed that not less than 75% of the net operating profits of the corporation should be applied to the payment of the principal of such loan. Eastern noted its acceptance of the agreement. At the request of FCC, the parties to the agreement filed individual financial statements. In due course the corporation was granted the permit.

Subsequently, Eastern and the plaintiff, Graybar, entered into an agreement on June 15, 1953, under which Graybar was to supply certain equipment and Eastern commenced operations. During the pendency of the application for the permit and license a representative of Graybar learned through examining the files of FCC of the agreement executed by the defendants.

The operation of the station was not profitable and Eastern soon found itself in financial difficulties. It is apparent that Graybar was in close communication with the operation and solicitious to promote its success. On October 9, 1953, the defendants advanced to Eastern approximately $29,000, for which they received notes. With the knowledge or consent of Graybar these funds were used for purposes other than reducing the obligation to it, although Eastern was in default on its liability to Graybar. On November 11, 1953, Thomas F. O'Malley, District Manager of Graybar, addressed a communication to the defendant, Doley, as President and Treasurer of Eastern, making reference to the agreement of January 24, 1952, here in controversy.

This letter recites in some detail the potential liability of the various defendants and contains the following language: "I am merely outlining this information for whatever good it may be at your end since I want you to be aware we intend to fully use the information as shown on the application form to show what an influence it had on our decision in extending this account in the event that things should not turn out as we very sincerely hope they will." A copy of that letter was sent to the Station Manager of Eastern with a notation from the District Manager of Graybar, stating in part "this is going to play a very important part in our further action should your efforts not meet with the success I very sincerely hope they will."

On December 3, 1953, a new contract was entered into between Eastern and Graybar to secure the debt due Graybar. In connection with the new contract a chattel mortgage was given Graybar to secure its obligation. Again Eastern was unable to comply with its agreement and the obligation became in default. While the record is not entirely clear concerning the time or details, it appears that by the early months of 1955 it was realized that Eastern was in serious financial difficulties and efforts were made to dispose of the station and permit by sale. Graybar was aware of and kept itself informed concerning these developments but made no further demand based upon the agreement.

On October 28, 1955, creditors of Eastern holding claims aggregating $3,458.17, filed a petition seeking the involuntary bankruptcy of Eastern. Time for filing responsive pleadings was extended several times and on January 23, 1956, an order was entered by one of the Referees of this Court, adjudicating Eastern a bankrupt. Among other creditors, Graybar filed proof of claim in the bankruptcy proceeding on June 12, 1956, asserting a claim in the amount of $164,090.95, with interest, based upon note and recorded conditional sales contract and chattel

mortgage. In that proof of claim paragraph numbered 6 reads as follows:

"That deponent * * * does not hold, and has not, nor has any person by his (or its) order, or to deponent's knowledge or belief, for his (or its) use, had or received, any security or securities for said debt (or liability), except Note and recorded conditional sales contract and chattel mortgage."

The proof of claim was filed on June 12, 1956, and was signed and verified by Thomas F. O'Malley, District Manager of Graybar. The District Manager took precaution of adding a paragraph to the proof of claim, reserving to Graybar the right to participate as an unsecured creditor in any assets not distributed to it as a secured creditor. Attached to the claim was copy of a chattel mortgage which appears to have been executed on December 31, 1953, securing the payment of $140,121.01, which was recorded in the Clerk's Office of the Corporation Court of the City of Newport News on February 19, 1954. There was also filed with the claim a conditional sales agreement between Graybar and Eastern dated June 15, 1953.

The bankruptcy proceedings were somewhat protracted in an effort to dispose of the assets of the bankrupt as an operating unit. While the licenses were not marketable, it was believed that the purchaser of an operating unit would occupy a position of advantage in obtaining such license transfer. During these proceedings Graybar agreed to the sale by the Trustee of the equipment covered by its liens and to participate on a prorata basis. Graybar made no disclosure to the Trustee concerning the agreement now under consideration and no suggestion that it represented an asset of the bankrupt nor security for its debt proven in bankruptcy.

The Trustee received a number of offers for the assets and on April 17, 1956, reported that the highest bid was $51,305 from a bidder named Siegel, represented by S. A. Steingold, Esquire. An order was entered by the Referee directing creditors to show cause why the offer should not be accepted. Subsequently the Trustee reported a further offer from Richard Eaton in the amount of $54,500 and recommended acceptance. Thereupon the bidder Siegel, by his attorney named, filed a petition for review, insisting that his offer should have been accepted. Counsel was appointed for the trustee and on July 18, 1956, Judge Hoffman filed a memorandum to the effect that Siegel was not a party to the proceeding and not entitled to a review. Thereupon the offer of Eaton was accepted.

The claim of Graybar in the amount of $164,090.94 was allowed and in the distribution of the proceeds received from the sale of the assets, Graybar received $23,052.45, being 50% of the amount remaining after payment of costs of administration as a secured claim and the sum of $12,045.10 of the balance remaining on its claim as an unsecured creditor. It will thus be seen that Graybar received some $35,000 on its claim from the total assets of some $54,000. The Trustee was discharged on June 8, 1957. On June 3, 1958, Eastern was dissolved by operation of Virginia law.

In this action, filed on September 14, 1957, Graybar seeks to recover the balance due it under the agreement of January 24, 1952, or, in the alternative, to hold the defendants liable as members of the Board of Directors of Eastern for failure to require contributions under the terms of the agreement. There were certain allegations of fraud contained in the original complaint but Graybar has specifically stated that it does not rely upon those allegations.

Briefly stated, Graybar contends that it is entitled to recover the balance due it from Eastern upon the theory that the agreement of January 24, 1952, is in the nature of a performance or payment bond or that the Directors are liable personally for failing to require the parties to that agreement to advance money to Eastern or that they may sue as third party beneficiaries under Section 55–22, Code of Virginia 1950.

In the early stages of the case great reliance was placed upon the contention that the agreement was in the nature of a performance or payment bond. In fact, for a while this appeared to be the principal claim upon which the plaintiff relied.

I find no merit in the contention. It is true that FCC, in considering applications for permits and licenses takes into consideration the financial ability of the applicant and unless financial ability is shown it follows that the application is denied. However, no provision of the act or regulations have been brought to my attention requiring a bond to guarantee anything to FCC nor to any one else. The agreement was nothing more nor less than a part of the financial statement of Eastern. Had Eastern failed to construct the station, no liability to FCC would have resulted. The permit and license would have been cancelled but no other penalty would have been imposed. This is an entirely different situation from one in which a contractor undertakes to perform an agreement which might result in loss to the other party. Had it been the intention of Congress there is ample precedent for making provision for performance or payment bonds.

In arguing a motion for summary judgment, it was intimated that evidence would be introduced to show that the agreement was considered or acknowledged by the parties as an obligation on their part to be responsible. Principally for that reason the motion was denied. The letter from Graybar to Doley of November 11, 1953, is the only evidence I find in the record which might be regarded as an expression by Graybar of its purpose to rely upon the agreement. That letter was directed to Mr. Doley as President of Eastern. It was not a communication to the individuals who signed the agreement nor was it a demand or request that the Directors of Eastern undertake any action on the agreement. Following that letter a new agreement was reached between Graybar and Eastern concerning the obligation and Graybar accepted a chattel mortgage as security but made no effort to have the parties to the agreement assume personal liability, either by formal action or by informal acknowledgment of liability.

Thus it will be seen that the position of Graybar is substantially as follows.

With the knowledge of the agreement between the defendants here in controversy, on June 15, 1953, Graybar entered into a contract with Eastern to supply certain equipment for the construction of the station. At that time no reference was made to any obligation on the part of the defendants under the agreement of January 24, 1952. During the early stages of the operation, financial difficulties developed with the knowledge of Graybar and on October 9, 1953, the defendants loaned Eastern approximately $29,000, which was used to meet other obligations, although at the time the amount due Graybar was in default. Then, on November 11, 1953, O'Malley, the District Manager of Graybar, in the letter referred to called to the attention of defendant Doley, President and Treasurer of Eastern, the potential liability of the defendants under the agreement of 1952. That letter shows thorough familiarity with the situation then existing and the terms of the agreement. No other demand was made upon either the officers or directors of Eastern or the defendants individually, but on December 3, 1953, Graybar entered into a new agreement with Eastern, under which the chattel mortgage was given Graybar.

By early 1955, Eastern being in serious financial difficulties, efforts were made to make sale of the station. Still Graybar made no move to obtain additional security from the defendants under the agreement nor to call upon the directors of Eastern to make demand upon the defendants. Thus, matters continued until October 28, 1955, when the involuntary petition in bankruptcy was filed. Time for filing responsive pleadings was extended and finally, approximately three months later, on January 23, 1956, Eastern was adjudicated a bankrupt. Still

there was no move on the part of Graybar concerning the agreement of 1952.

Following the adjudication, efforts were made to dispose of the station as an operating unit. Bids were submitted and a petition for review from the action of the Referee in accepting a bid was filed by one of the bidders represented by one of counsel for Graybar in the instant proceeding. Then, on June 12, 1956, O'Malley, the District Manager of Graybar, filed a verified proof of claim in which he certified that neither Graybar nor any other person for its use to its knowledge had any security for the obligation except the note and recorded conditional sales contract and chattel mortgage. Graybar agreed to an arrangement under which the assets covered by its liens were sold as a part of the station, clear of the liens. Graybar participated in the distribution as before recited, receiving approximately $35,000 from the total assets of $54,-000. The Trustee was discharged on February 8, 1957. During all this proceeding no claim was asserted by Graybar under the agreement of 1952. It was not called to the attention of the Trustee in Bankruptcy. The officers and directors received no demand for action on their part. The defendants, who were parties to the agreement, were not informed of any claim against them under the agreement.

On September 14, 1957, approximately seven months after the Trustee had been discharged, Graybar filed this action. During the period intervening between the date of O'Malley's letter of November 11, 1953, and September 14, 1957, a period of three years and ten months, Graybar slept on the rights it now asserts. During this time, with the knowledge and participation of Graybar, a definite change had come about in the situation of the parties. Graybar and Eastern had entered into a new agreement under which Graybar was given additional security. An involuntary petition in bankruptcy had been filed and after approximately three months' delay Eastern was adjudicated a bankrupt. Numerous negotiations concerning sale of assets took place. Graybar participated in the bankruptcy proceeding, represented by counsel who brought this action. In that proceeding one of the bidders for the assets was represented by another member of the bar who is counsel in this proceeding. O'Malley, the District Manager for Graybar, filed a verified proof of claim, certifying that Graybar had no security nor did any one else for its benefit, excepting its claim in the bankruptcy proceedings. The proceeding was brought to a conclusion and distribution was made. Graybar was the principal creditor and received the major portion of the proceeds. All this occurred without any move on the part of Graybar to assert a claim under the 1952 agreement. Then, seven months after the discharge of the Trustee, Graybar for the first time undertakes to hold the defendants liable under that agreement. It is belaboring the point to discuss the change of status. Had the defendants been called upon to advance money to Eastern as a going concern, the amounts which Graybar now claims they are liable for would have been sufficient to discharge its indebtedness and the stockholders would have had something of value. As matters now stand, their situation has been completely changed. The assets of the corporation are gone and the corporation, itself, has ceased to exist. A mere statement of the facts without a discussion of the authorities is sufficient to show that Graybar is estopped to assert at this late day any claim to which it might have been entitled as a third party beneficiary under the Virginia Statute, or under a claim against the directors of the corporation for any alleged failure on their part to require contribution under the agreement.

It follows that it is not necessary to consider what rights Graybar might have had originally. Such as they were they have been long since lost by its conduct.

In view of the discharge of the jury without verdict because there was no issue of fact for its determination, it would seem that the appropriate proce-

dure at this stage is the granting of the motion to amend filed by the plaintiff and of the motion for summary judgment filed by the defendants.

Such an order will be entered upon presentation.